IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



WiAV SOLUTIONS LLC

     Plaintiff,

v.                         Civil No. 3:09cv447

MOTOROLA, INC. et al.,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion to Dismiss (Docket No. 146). For the reasons set forth below, the motion will be granted.

## BACKGROUND

On July 14 2009, WiAV Solutions LLC ("WiAV") filed this action against Motorola, Inc., Nokia Corp, Nokia Inc., Palm, Inc., Personal Communications Devices LLC, Personal Communications Devices Holdings LLC, Sharp Corp., Sharp Electronics Corp., Sony Ericsson Mobile Communications AB, Sony Ericsson Mobile Communications (USA) Inc. and UTStarcom, Inc.[1] WiAV also named Mindspeed Technologies, Inc. ("Mindspeed") as the Defendant patent owner. Of the nine patents at issue in the suit, seven are currently

---

[1] Sharp Corp. and Sharp Electronics Corp. have since been dismissed from the action.

assigned to Mindspeed (the "Mindspeed Patents").[2]   On
November 13, 2009, all of the remaining Defendants, save
Sony Ericsson Mobile Communications AB (the "Defendants"),
filed a Joint Motion to Dismiss (Docket No. 146) for lack
of standing.   The Mindspeed Patents are the subject of the
Defendants' Motion to Dismiss.   The facts relevant to the
Motion to Dismiss follow.

     On  September  18,  1998,  Rockwell  International
Corporation ("Rockwell"), through its subsidiary Rockwell
Semiconductor Inc. ("Rockwell Semiconductor") filed four
patent applications.   (Def. Mem. at 2.)   Those patents
ultimately issued as the '573, '814, '992, and '493
patents.   (Id.)   Subsequent to the issuance of those
patents, Rockwell Semiconductor changed its name to
Conexant Systems, Inc. ("Conexant").   On November 30, 1998,
Conexant filed a patent application which ultimately issued
as the '606 and '578 patents.   (Id.)   Thus, in 1998
Rockwell was the beneficial owner of six of the seven
patent applications which eventually became the Mindspeed
Patents.   (Id.)

---

[2] The Mindspeed Patents are U.S. Patent Nos. 6,104,992;
6,256,606; 6,385,573; 6,507,814; 6,633,841; 7,120,578; and
7,266,493 (referred to as the '992, '606, '573, '814, '841,
'578, and '493 patents).

## A.   The Rockwell-Conexant Agreement

In January 1999, Rockwell and Conexant entered into a distribution agreement (the "Rockwell-Conexant Agreement") as part of a spin-off of Conexant. (Def. Mem. at 2.) The Rockwell-Conexant Agreement assigned all patents, patent applications, and other intellectual property relating to Rockwell's semiconductor business to Conexant. (Id.) The application for the seventh and final Mindspeed Patent, the '841 patent, was filed in July 1999, but under the terms of the agreement, it was assigned to Conexant. (Id.) Thus, Conexant was the assignee off all seven of the Mindspeed Patents.

Additionally, under the terms of the Rockwell-Conexant Agreement, Conexant granted Rockwell licenses to Conexant's intellectual property and the right to sublicense that intellectual property to Rockwell affiliates in connection with a sale of Rockwell's business related to the intellectual property.[3]   (Def. Ex. A at § 3.11(b).)

---

[3] Section 3.11(b) states in pertinent part:

[Conexant], on behalf of itself and [Conexant's] Subsidiaries, hereby grants to Rockwell Science Center a royalty-free, world-wide, irrevocable, non-exclusive license under all intellectual property rights (including, without limitation, patents, patent applications, trade secrets, copyrights, or other similar industrial property rights, but excluding trademarks, trade names, service marks, trade dress or any other form of trade identity)

3

Finally, Rockwell was granted an option to acquire a license in the Mindspeed Patents in any field of use not a part of Rockwell's business at the time of the Rockwell-Conexant Agreement.[4]  (Id. at § 3.11(f).)

## B.    The Conexant-Skyworks Agreement

On January 8, 2003, Conexant and its subsidiary, Skyworks, entered into a license agreement (the "Conexant-Skyworks Agreement").    Section 2.1(a) of the Conexant-

---

which constitute Semiconductor Assets [ ] and which are owned by [Conexant] or under which [Conexant] has a right to license without the payment of royalties to a third party immediately after the Time of Distribution to make, have made, use, import, sell or otherwise dispose of products, or to practice any process in connection therewith, in the businesses of the Rockwell Group (other than the Semiconductor Business) being conducted at the Time of Distribution or any related extensions or expansions thereof; said non-exclusive license being transferable only by sublicenses (to the extent permitted in the case of any restricted grant to [Conexant] or a [Conexant] Subsidiary, as a licensee) to members of the Rockwell Group and in connection with the sale of all or any part of the Rockwell Group's businesses to which such intellectual property right relate.

[4] Section 3.11(f) states in pertinent part:

If any member of the Rockwell Group requires a license with respect to any of the intellectual property contained in the Semiconductor Assets which is not covered by this Section 3.11 with respect to its business existing at the Time of Distribution, [ ] upon notice of the party requiring such a license, the parties will negotiate in good faith the grant of such a license, upon reasonable terms, including royalties, permitting the requesting party to undertake activities in fields of use which do not have an adverse competitive effect on the business of the granting party and its Affiliates.

Skyworks Agreement granted Skyworks an "exclusive" license over the Mindspeed Patents in the field of Wireless Handsets.[5]   (Def. Ex. C at § 2.1(a).)   This license was subject to any preexisting licenses and subject to all rights reserved by Conexant in Section 2.1(d).

In Section 2.1(d), Conexant reserved the right to "make, have made, use, offer to sell, export, and import Conexant Products in the field of Wireless Handsets" and to license any of the above rights to its subsidiaries and joint development partners.[6]   (Id. at § 2.1(d)(i).)   The

---

[5] Section 2.1(a) states:

**Exclusive License Grant.**   Subject to any preexisting licenses, Conextant hereby grants to Skyworks a fully-paid, royalty-free license under the Speech Coder Patents and MPEG Patents to make, use, offer to sell, sell, export, and import Products in the field of Wireless Handsets only. This license is exclusive, subject to the rights reserved by Conexant in Section 2.1(d).

[6] Section 2.1(d)(i) states:

**Reservation of Rights.**   Conexant reserves to itself the following rights under the Speech Coder Patents and the MPEG Patents: (A) to make, have made, use, offer to sell, sell, export, and import Conexant Products in the field of Wireless Handsets; and (B) to license any or all of these rights described in clause (A) above (x) to Conexant's Subsidiaries; (y) subject to Section 6.2, in connection with a divestiture, sale, spin-off of any Conexant business unit, product line, or business operation; and/or (z) to any third party that works under a joint development agreement with Conexant to jointly develop a new Conexant Product or to jointly redevelop an existing Conexant Product, wherein the Conexant contribution comprises a

Conexant-Skyworks Agreement further provided that any license granted by Conexant to Mindspeed may include the right to grant sublicenses to Mindspeed's subsidiaries and joint development partners.[7]  (Id. at § 2.1(d)(iii).)

Additionally, the Conexant-Skyworks Agreement granted Skyworks the exclusive right to license and assert the Mindspeed Patents as to Qualcommm in all fields of use.[8] (Id. at §§ 4.1(a), 4.2(a).)

---

substantial hardware contribution to the resulting Conexant Product developed under the joint development agreement.

[7] Section 2.1(d)(iii) states:

**Mindspeed.** Any license of any or all of the rights reserved by Conexant in Section 2.1(d)(i) granted by Conexant to Mindspeed must be limited to Mindspeed Products. Any such license may include the right to grant sublicenses only (a) to Subsidiaries of Minspeed, (b) subject to Section 6.2, in connection with a divestiture, sale, or spin-off of any Mindspeed business unit, product line, or business operation, and/or (c) to any third party that works under a joint development agreement with Mindspeed to jointly develop a new Mindspeed Product or to jointly redevelop an existing Mindspeed Product, wherein the Mindspeed contribution comprises a substantial hardware contribution to the resulting Mindspeed Product developed under the joint development agreement. Any such license granted by Conexant to Mindspeed, may, in Conexant's discretion, remain in effect if and when Mindspeed ceases to be a Subsidiary of Conexant.

[8] Section 4.1(a) states in pertinent part:

**Skywork's Rights.** Notwithstanding anything to the contrary in this Agreement of any other agreement between the Parties, as between Conexant and Skyworks, Skyworks will have the exclusive right to assert against Qualcomm infringement claims (including counterclaims and cross-

6

## C. The Conexant-Mindspeed Agreement

In June 2003, Conexant assigned the Mindspeed Patents to Mindspeed as part of an agreement (the "Conexant-Mindspeed Agreement"). Conexant reserved its right to sublicense the Mindspeed Patents to its subsidiaries and joint development partners.[9] (Def. Ex. B at § 5.03(b).)

---

claims) (i) under the Speech Coder Patents in all fields [ ]. Except as expressly allowed under Section 12.7, Skyworks may not assign its rights under this Section 4 (including its rights under Section 4.2) to any person or entity without Conexant's prior, written consent, which Conexant may grant or deny in its discretion.

Section 4.2(a) states:

**License to Skyworks.** In addition to the rights licensed to Skyworks in Section 2 and Section 3, Conexant hereby grants to Skyworks an exclusive (without reservation) fully-paid, royalty-free license to sublicense to Qualcomm under the Speech Coder Patents (in all fields) and the MPEG Patents and Conexant RF Patents (only in the Wireless Handset field) any or all of the following rights, in Skyworks' discretion: the rights to make, have made, use, offer to sell, sell, export, and import any and all Products. This license is irrevocable (except as provided in Section 4.2(b) and Section 7.1) and non-assignable (except as provided in Section 12.7).

[9] Section 5.03(b)(i) states in part:

Mindspeed-Owned Intellectual Property. Subject to Section 5.03(b)(v) and Section 5.03(c) and subject to any licenses or rights previously granted to a third party, effective as of the Time of Distribution, Mindspeed, on behalf of itself and the Mindspeed Subsidiaries, hereby grants to the Conexant Group a nonexclusive, worldwide, irrevocable (except as provided in Section 5.03(b)(vi)), royalty-free license, without the right to assign or grant sublicenses except as provided in Sections 5.03(b)(iii) and

D.   **The Skyworks-Qualcomm Agreement**

In April 2005, Skyworks and Qualcomm entered into a license agreement (the "Skyworks-Qualcomm Agreement") involving the Mindspeed Patents.[10]  Under the terms of that agreement Skyworks granted Qualcomm the right to grant sublicenses of the Mindspeed Patents to Qualcomm affiliates.[11]

---

(iv), under all Intellectual Property that constitutes Mindspeed Assets.

Section 5.03(b)(iv) reads in part:

Sublicensing.    Subject   to   Section   5.03(b)(v)(b), Conexant or a Conexant Subsidiary may sublicense any or all of its rights under the license granted in Section 5.03(b)(i) (other than the right to sublicense provided herein) (A) to any entity that is, at the time when such sublicense grant is made, a direct or indirect wholly-owned subsidiary of Conexant; (B) to any third party in connection with a divestiture, sale, or spin-off of any business unit, product line, or business operation of Conexant or a Conexant Subsidiary; and/or (C) to any third party that works under a joint development agreement with Conexant to jointly develop a new Conexant Product or to jointly redevelop an existing Conexant Product wherein the Conexant contribution comprises a substantial hardware contribution to the resulting Conexant Product developed under the joint development agreement.

[10] The Skyworks-Qualcomm agreement explicitly referenced numerous patents to be included in the agreement, including five of the seven Mindspeed Patents.  (Def. Ex. J at § 1.) However, the Skyworks-Qualcomm Agreement was not limited to those patents explicitly referenced.  (Id.)

[11] Section 3.4 states in pertinent part:

Right to Sublicense Affiliates.   QUALCOMM shall have the right to grant sublicenses only to Affiliates of

8

## E.    The Skyworks-WiAV Agreement

In September 2007, Skyworks assigned its licensing rights under the Conexant-Skyworks Agreement to WiAV (the "Skyworks-WiAV Agreement").[12]    (Def. Ex. D at § 2(a).)    This

---

QUALCOMM with respect to any rights conferred upon QUALCOMM under this Agreement.

[12] Section 2(a) states in pertinent part:

Assignment of Vocoder Patents.
    As of the Effective Date, Skyworks hereby sells, assigns, transfers, and conveys to WIAV, subject to any preexisting licenses, more specifically, all encumbrances listed on Exhibit C, all of Skyworks' right, title, and interest, in and to the Vocoder Patents in the Wireless Handset field of use (collectively, "Vocoder Patent Rights").    By way of example, the assigned rights in the immediately preceding sentence include:
   (i) an exclusive, fully paid [ ], royalty-free license under the Vocoder Patents to make, have made, use, offer to sell, sell, export, and import Products in the field of Wireless Handsets only until the expiration or abandonment of all the Vocoder Patents;
   (ii) exclusive right to assign any or all rights under any of the Vocoder Patent Rights to any other person or entity in its discretion;
   (iii)    exclusive right to sublicense any or all of its rights under the Vocoder Patent Rights (including the right to grant further sublicenses) to any other person or entity in its discretion; and
   (iv) exclusive right to assert against any and all third parties claims (including counterclaims and cross-claims) of infringement of the Vocoder Patents based on the unauthorized manufacturing, use, sale, offering to sell, importing, or exporting of Products in the field of Wireless Handsets.    This exclusive enforcement right includes the right to sue for past, current and future infringements of the Vocoder Patents, including the right to license and to collect and

9

assignment was subject to the preexisting licensing and sublicensing rights retained by Rockwell, Conexant, and Mindspeed and granted WiAV certain "exclusive" rights in the Mindspeed Patents. (Id.) Despite assigning its right under the Conexant-Skyworks Agreement, Skyworks retained for itself the non-assignable right to license Qualcomm. (Def. Mem. at 3.) Finally, Skyworks agreed "not to grant any additional licenses and/or covenants not to sue under, or otherwise encumber, any [Mindspeed Patent] after the Effective Date." (Def. Ex. D at § 5(a)(vii).)

## F. The WiAV-Mindspeed Breach of Contract Suit

In September 2008, WiAV filed an action against Mindspeed for breach of contract. (Def. Mem. at 7.) A Settlement Agreement and Mutual Release entered into in that action provided that nothing in the settlement limited "the existing rights of either Mindspeed or WiAV to license or sublicense rights in the [Mindspeed] Patents within their permitted fields of use." (Def. Ex. E at ¶ 19.) Mindspeed also acknowledged that "WiAV has the exclusive right to assert against any and all third parties claims

---

> receive any damages, royalties, injunctive
> relief, and/or settlements for such infringements
> of such Vocoder Patents, and sue under any past,
> current, or future patent causes of action
> relating to any of the inventions or discoveries
> described or claimed in the Vocoder Patents.

10

(including counterclaims and cross-claims) of infringement of the [Mindspeed] Patents [ ] in the field of 'Wireless Handsets.'"  (Id. at ¶ 7(c).)

## G.   Licensing Through Sipro Lab

Sipro Lab Telecom ("Sipro") is a licensing agent who administers a patent pool related to speech coding technology. (Def. Mem. at 10.)  Sipro's website identified Mindspeed as a licensor offering licenses as part of a patent pool for the G.729.1 speech coding standard, to which the Mindspeed Patents relate.   (Def. Ex. G.) Specifically, the website reveals that licenses for the '573 and '493 patents are being offered through the patent pool.  (Def. Ex. H.)   Sipro's G.729.1 Patent License Agreement excludes wireless applications from the patent pool it seeks to license, but includes WLAN applications in the patent pool.[13]

---

[13] Section 1.18 states in pertinent part:

"**Licensed Product**" means that portion of an End-Product other than a Wireless Application that complies with the G.729.1 Standard [ ].

Section 1.29 states:

"**Wireless Applications**" means any product or service (including without limitation any hardware, software, mobile phone, smart phone, PDA, or any base station, base station controller, radio network controller, switching center, gateway, or any other network infrastructure component) capable of communication or supporting

## DISCUSSION

### I.  The Legal Standard

A motion to dismiss for lack of subject matter jurisdiction under the doctrine of standing is assessed pursuant to the principles of Fed. R. Civ. P. 12(b)(1). Of course, it is the burden of the party bringing a case to prove the existence of subject matter jurisdiction. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). In assessing a motion to dismiss under Rule 12(b)(1) the court may consider evidence outside the pleadings without converting the motion to one for summary judgment. Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004). Thus, the Court will consider the various agreements relating to the Mindspeed Patents in addressing the Motion to Dismiss.

Article III of the Constitution limits the power of the courts to the resolution of "cases" and "controversies." U.S. CONST., Art. III, § 2. To show that a case or controversy exists, a plaintiff must meet both constitutional and prudential standing requirements. Morrow v. Microsoft Corp., 499 F.3d 1332, 1338 (Fed. Cir. 2007).

---

communication over any wireless interface [ ]. For purpose of this definition and of this Agreement, WLAN [ ] shall not constitute a Wireless Application.

To demonstrate constitutional standing, the plaintiff must allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Id. at 1338-39 (citing Hein v. Freedom From Religion Found., Inc., 127 S.Ct. 2553, 2555-56 (2007)). Often, as here, standing turns on the nature of the claim asserted and the statutory provision on which the claim rests. Morrow, 499 F.3d at 1339.

A "patentee" is entitled to bring a "civil action for infringement of his patent." 35 U.S.C. § 281. A "patentee" includes not only the patentee to whom the patent was issued but also "the successors in title to the patentee." 35 U.S.C § 100(d). A patent grant "bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention," and this right to exclude "is the legal interest created by statute." Morrow, 499 F.3d at 1339. Constitutional injury occurs "when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights." Id. Exclusionary rights are thus the hallmark of standing in a patent suit.[14]

---

[14] The right to sue is also considered a hallmark of standing in a patent suit. Here, there is no dispute that WiAV has the contractual right to sue. However, a plaintiff in a patent suit must have both the right to sue

13

The courts have delineated two types of plaintiffs that have constitutional standing to sue for patent infringement. First, a party who holds all rights or "all substantial rights" under a patent has standing to bring suit in its own name. Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1484 (Fed. Cir. 1998). Second, a licensee has standing to sue if its license is exclusive and the patent owner is joined as a party. Id.

A third category of plaintiff, a bare licensee, "has no standing at all." Id. This category of plaintiff "hold[s] less than all substantial rights to the patent and lack[s] exclusionary rights under the patent." Morrow, 499 F.3d at 1340. The mere existence of a "right to sue" provision within the plaintiff's license "cannot, of its own force, confer standing on a bare licensee." Textile Prods., 134 F.3d at 1485.

## II. WiAV's Constitutional Standing

Whether or not WiAV has standing to sue turns on whether WiAV is an exclusive licensee or a bare licensee.[15] An exclusive license is a "license to practice the

---

and the right to exclude. See Morrow, 499 F.3d at 1341. Because the dispute between the parties centers around WiAV's right to exclude, the Court will address that right in detail.

[15] Neither party contends that WiAV holds all rights or all substantial rights to the Mindspeed Patents.

14

invention. . .accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave." Textile Prods., 134 F.3d at 1484. "Determining whether a licensee is an exclusive licensee or a bare licensee is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant." Id. It is the substance of the arrangement that controls, not the use of the word "exclusive." Id.

A licensee who was granted an exclusive license subject to prior, nonexclusive licenses has standing as an exclusive licensee. See Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333 (Fed. Cir. 2001) (holding that a licensee had an exclusive license even though the license was granted subject to a prior nonexclusive license); Abbott Labs. v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995) (holding that a licensee had an exclusive license when the license was granted subject to eight non-exclusive licenses and the assignee's right to make, use, and sell products that exploited the patents); Hill Phoenix, Inc. v. Systematic Refrigeration, Inc., 117 F. Supp. 2d 508, 512-13 (E.D. Va. 2000) ("The Federal Circuit has never stated that the

licensee must have the right to exclude *all* others. If a patentee grants a second license that is subject to a prior-existing, nonexclusive license, but otherwise provides the second license with the right to exclude all others except the prior licensee, then the subsequent licensee has proprietary rights sufficient to confer standing.") Under this rule, the mere fact that WiAV was granted its license subject to preexisting licenses does not strip WiAV of an exclusive license, and consequently, standing. Indeed, if all that the prior licensees retained were non-exclusive licenses, WiAV would have standing under this line of cases.

However, a licensee is not exclusive if others retain the right to grant additional licenses, even when the right to sublicense is limited only to subsidiaries and affiliates. Textile Prods., 134 F.3d at 1484; See Medtronic Sofamor Danek USA, Inc. v. Globus Med., Inc., 637 F. Supp. 2d 290, 306 (E.D. Pa. 2009) (holding that a licensee did not have an exclusive license when another entity "expressly reserved for itself the right to [ ] grant manufacturing licenses to its subsidiaries, parents, commonly owned entities, and affiliates."); Raber v. Pittway Corp., 1992 WL 219016, at *3 (N.D. Cal. 1992) (holding that a licensee's interest was not exclusive when

the licensor retained the right to grant sublicenses to its subsidiaries); But see Advanced Tech. Incubator, Inc. v. Sharp Corp., 2009 WL 2448156 (E.D. Tex. July 6, 2009) (holding that a licensee did have standing when the license was granted subject to prior licenses.[16]).       Here, the various agreements between the licensees and assignees of the Mindspeed Patents show that Rockwell, Conexant, Mindspeed, and Qualcomm all retain the right to grant new licenses in the field of wireless handsets.   And, while these rights are limited to sublicensing to subsidiaries, affiliates, and joint development partners, those limitations do not alter WiAV's rights, or lack thereof, over the Mindspeed Patents.   Because at least four entities retain a right to grant sublicenses on the Mindspeed Patents, WiAV's claim of exclusivity is defeated and WiAV must be categorized as a bare licensee.

---

[16] The language of the opinion, and a related Order in the same action, are unclear as to whether the prior licensee retained the right to merely use the patents or to sublicense the patents.   However, the majority of the language suggests that the licensee took subject only to the prior licensee's right to use, not sublicense the patents.   If this is correct, this case falls squarely within the general rule that a prior license does not destroy exclusivity but a prior right to grant sublicenses does.   If, in fact, the licensee took subject to a prior right to grant sublicenses, this case does not change the Court's analysis, as the grant of standing in Advanced Tech. runs counter to the weight of authority.

17

Moreover, the Defendants contend that Skyworks also has an interest in the Mindspeed Patents that destroys WiAV's claim of exclusivity. Under the Conexant-Skyworks Agreement, Skyworks retained the exclusive right to license the Mindspeed Patents to Qualcommm in all fields of use. This right was assignable only with the consent of Conexant. Here, there is no evidence that Conexant granted its consent for Skyworks to assign this right, nor any evidence that Conexant transferred its right to consent in the Conexant-Mindspeed Agreement.[17] Because Conexant neither gave its consent nor transferred its right to consent, Skyworks could not transfer its exclusive right to license Qualcomm and instead, retains that right to this day.[18] This further weakens WiAV's claim of exclusivity.

Finally, in addition to Rockwell, Conexant, Mindspeed, Qualcomm, and Skyworks' right to sublicense the Mindspeed Patents, it appears that Sipro may have the authority to

---

[17] WiAV argues that Conexant did transfer its right to consent to Mindspeed in the Conexant-Mindspeed Agreement, when it transferred some of its patents and contracts to Mindspeed. This argument is unavailing because transfer of the patents does not serve to transfer the contractual right to consent and that right is not included within the term "contracts" as defined by the Agreement.

[18] Even if the Defendants assertions on the Qualcomm issue are incorrect and Skyworks no longer retains the right to license Qualcomm, WiAV still lacks standing because at least four other entities retain the right to sublicense.

18

license two of the Mindspeed Patents (the '573 and '493 patents).[19] Despite excluding "Wireless Applications" from the license, WLAN technology[20] is not excluded from the license. According to the Defendants, some of the accused products in this action have WiFi capability. (Def. Reply at 14.) Because Sipro has the right to grant licenses for at least the WiFi application of two of the patents, WiAV's argument regarding exclusivity is, again, further weakened.[21]

Despite the clear law to the contrary, WiAV argues that the Court should adopt a new legal principle that, if a grantor retains a limited right to sublicense, it does not defeat exclusivity. According to WiAV this rule will avoid the situation, present here, in which no one has standing to assert the patents. That argument runs counter to well-settled decisions of the Federal Circuit defining

---

[19] The Defendants argue that Sipro also has the right to license the '814 Patent because it is the child of the '493 Patent and '573 Patent, and thus is implicated in the licensing pool.

[20] The Defendants define WLAN as a "wireless technology also referred to as WiFi that is used by many wireless handsets for data transmission and voice-over-IP calls." (Def. Reply at 14.)

[21] Again, even if the Defendants are incorrect in asserting that Sipro has rights to sublicense those patents, WiAV still lacks standing because at least four other entities retain the right to sublicense.

the controlling principles of standing in this field. It is not the office of district courts to refashion those rules merely because a licensee did not appreciate the effect of those settled principles at the time it was contracting for its rights. The time for WiAV to have addressed the concern it raises now was at the time of contracting. If, at that time, no viable contracting alternatives existed to give WiAV the right of exclusivity it wanted, then perhaps the contract would not be entered. Whatever the business consequences may have been, the failure to sort them out at the time of contracting presents no justification for changing the settled law of standing. Because WiAV can alleviate the standing issue through contracting, and because it runs against well-settled legal principles, the Court declines to adopt the rule suggested by WiAV.

In summation, at least four entities, and possibly as many as six, retain the right to sublicense the seven patents at issue. The retention of the right to sublicense by even one of these entities is sufficient to destroy WiAV's claim that is has an exclusive license. Thus, WiAV is not an exclusive licensee, but rather a bare licensee which lacks constitutional standing to assert claims for infringement of U.S. Patent Nos. 6,104,992; 6,256,606;

6,385,573; 6,507,814; 6,633,841; 7,120,578; and 7,266,493.
Because WiAV lacks constitutional standing, the Court need
not address matters of prudential standing.[22]

## CONCLUSION

For the reasons set forth above, the Defendants'
MOTION TO DISMISS (Docket No. 146) is granted.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 17, 2009

---

[22] The portions of the agreements cited in this Memorandum
Opinion or their equivalents were cited by counsel for the
parties in open court during the December 16, 2009 hearing.
Counsel for the parties agreed at the time that those
portions of the agreement did not contain any confidential
information.